WINTERS GOVERNMENT SECURITIES CORPORATION, a Florida Corporation, Plaintiff,

v.

FIRST NATIONAL BANK OF BRECK-ENRIDGE, a national banking association, and H. Robert Hertzenberg, individually, Defendants.

No. Civ. 6–78–168.

United States District Court,
D. Minnesota.

March 25, 1980.

sions apply to the jurisdiction of federal courts as well. *Fraley v. Chesapeake & Ohio Railway*,   397 F.2d 1 (3d Cir. 1968).

Jeremiah J. Kearney, O'Connor & Hannan, Minneapolis, Minn., Nolan P. Chipman, Paul, Landy & Beiley, Miami, Fla., for plaintiff.

Samuel L. Hanson, Briggs & Morgan, St. Paul, Minn., for defendants.

EDWARD J. DEVITT, Chief Judge.

This case was tried to the court on January 21 and 22, 1980. Plaintiff, Winters Government Securities Corporation, is a bankrupt Florida corporation, and this action is being prosecuted by the trustee on behalf of plaintiff's creditors. Defendant, First National Bank of Breckenridge, is a small Minnesota bank, with assets of about $19,000,000. The jurisdiction of the court is based on diversity of citizenship. The court finds for defendant and directs that judgment be entered accordingly.

*FACTS*

Plaintiff, Winters Government Securities Corporation, prior to going bankrupt was in the business of buying and selling government securities. In this action plaintiff alleges that defendant, First National Bank of Breckenridge, contracted to purchase from plaintiff four Government National Mortgage Association (GNMA) futures, each of $1,000,000 denomination, then refused to accept delivery on the dates agreed upon. Defendant bank denies every having agreed to purchase the four GNMAs at issue. Rather, defendant's position is that an employee of plaintiff, Mr. Heimann, was surreptitiously trading on the bank's account without the bank's authorization and contrary to specific instructions from the bank.

To understand this controversy, a basic understanding of GNMA securities and the condition of the GNMA market in late 1976 —early 1977 is helpful. A GNMA security is a pool of residential real estate mortgages insured by various agencies of the federal government. GNMA securities may be sold either for immediate delivery (whole bonds) or for future delivery if the underlying mortgages have not yet been packaged and approved but are expected to be at some future date (futures). An investor typically has one of two motivations for purchasing GNMA securities: (1) to make them a relatively permanent part of its portfolio; or (2) to purchase on a speculative basis, hoping to resell at a higher price prior to the delivery—payment date, commonly done with GNMA futures.

During the latter part of 1976 the market for GNMA securities, especially GNMA futures, was quite strong. As a result investors found GNMA futures during this period to be an attractive short range investment, whereby they could purchase a futures contract, then resell before the delivery—payment date, thus cashing in on the rising market. In early 1977, however, the GNMA market began a marked decline. As a consequence of this decline, investors who had purchased GNMA futures for speculative reasons but had not resold them prior to the decline suffered substantial losses. An additional consequence was that some investment firms specializing in government securities, such as plaintiff, went bankrupt.

Against this backdrop, the facts of the present case will be analyzed. Many of the facts do not appear to be disputed. The parties agree that defendant bank was first contacted by plaintiff, through its salesman, Mr. Heimann, in October of 1976. After several telephone conversations with Heimann, the bank, through its president, Mr. Hertzenberg, agreed on October 25, 1976, to purchase two $25,000 GNMA "whole" bonds from Winters for immediate delivery. These bonds were delivered to the bank and later resold to Winters. They are not among the securities in dispute in this case.

It is also undisputed that in November of 1976 defendant bank for the first time agreed to purchase a GNMA future from plaintiff—a $500,000 GNMA future with a January delivery date. Defendant bank resold this GNMA future to plaintiff the following day, at a small profit to the bank. Thus, the purchase was for the purpose of realizing a quick profit upon resale, and the GNMA did not become a part of the bank's relatively small $5,000,000 investment portfolio.

Beyond the above facts, the parties' positions diverge radically. During the remainder of November and December of 1976 plaintiff, through its salesman, Heimann, made numerous sales and repurchases of GNMA futures for defendant bank's account. The bank claims these transactions were not authorized by it prior to being made. Rather, alleges the bank, it ratified these transactions after the fact because it was realizing a profit on the transactions. The bank's position in effect is that it acquiesced through late November and December in Heimann's practice of trading on its account because the market was rising during this time and the bank had an economic incentive to ratify the transactions.

However, claims the bank, in late December of 1976 it became nervous about Heimann's practice of trading on the bank's account and directed him to stop that practice. This order was given during a December 28 telephone conversation between Heimann and the bank's president, Mr. Hertzenberg. Three of the four GNMA futures in dispute were, according to Winters, purchased by the bank after this December 28, 1976 telephone conversation.[1] Furthermore, the bank claims it never received written confirmation for these alleged sales until mid-February 1977. This was the first time the bank even became aware of plaintiff's claim that the bank had purchased the three GNMA futures. The fourth GNMA future in dispute, however, was allegedly purchased prior to December 28.[2] As to this GNMA, the bank denies ever having authorized its purchase and further asserts that plaintiff repurchased this GNMA from the bank. This latter assertion is evidenced by a letter from Heimann to the bank dated January 4, 1977, which indicates this fourth GNMA had been repurchased from the bank by Winters, at a profit to the bank.

Plaintiff's view of the case differs markedly from that of the defendant bank. Plaintiff asserts that the bank orally agreed to purchase the four GNMAs on the dates alleged, then reneged on the deal when the market for GNMAs fell in January of 1977. Among other things, plaintiff points to stamp machine marks on the confirmation slips for these GNMAs, which, it argues, indicate they were sent to the bank in early January of 1977, and to a deposition of Mr. Heimann, wherein he claims all the transactions between Winters and the bank were authorized in advance by Mr. Hertzenberg.

■ The court finds plaintiff has not proved its claims by the greater weight of the evidence and views defendant's version of the facts to be the more plausible. The circumstances as we see them are as follows. Mr. Heimann, as a new trader for plaintiff, was anxious to obtain new clients. His fellow traders during the latter part of 1976, when the GNMA market was active and bullish, were making substantial commissions. Heimann, also desiring substantial commissions but lacking a large clientele, began to trade on the bank's account without its prior authorization. While the market was on the rise the bank ratified these transactions for the obvious reason that the transactions were profitable for all parties—the bank, Winters, and Heimann. There is no reason to doubt, however, that Heimann was instructed to cease further unauthorized transactions as of December 28, 1976. Thus the three GNMA futures purchased after that date were not autho-

1. These three GNMA futures have been referred to by the parties as TBA 418, TBA 432, and TBA 433.

2. This fourth GNMA is referred to by the parties as TBA 287.

rized by the bank nor were these purchases subsequently ratified.[3]

The fourth GNMA future in dispute allegedly was purchased by the bank before the December 28 instruction to Heimann not to make further purchases for the bank's account. However, the letter of January 4, 1977, from Heimann to the bank shows that this GNMA had been repurchased from the bank by Winters. Thus, defendant bank cannot now be held liable as to this GNMA future either.

## CONCLUSION

The court concludes that as to the three GNMAs dated after December 28, 1976, the defendant bank never agreed to or ratified the purchases. As to the fourth GNMA in dispute, even if the bank ratified the purchase, plaintiff subsequently agreed to repurchase it from the bank, so the bank therefore cannot be held in breach.

The Clerk is directed to enter judgment for defendant.

**3.** The plaintiff's argument based on stamp machine marks on the confirmation slips is not persuasive. Those marks do not establish that the slips were actually mailed in early January of 1977, for Heimann in pursuance of his scheme presumably could have intercepted them. Moreover, the mailing of the confirmation slips does not establish the underlying oral agreement.